My name is Mark John Doe, and I represent the plaintiffs in this action. I reserve five minutes for rebuttal. So, in this appeal, plaintiffs bring claims on behalf of the O'Reilly Automotive, Inc. Profit Sharing and Savings Plan, a 401k plan, retirement plan, and a billion-dollar plan against O'Reilly, its board of directors, and members of the Planned Investment Committee for alleged breaches of fiduciary duty that occurred from May 2, 2016, through the date of judgment. The district court dismissed the amended complaint and oral argument on June 13, 2023, without providing leave to amend the complaint. Counsel, I'm sorry to interrupt, but it would help me a little if you'd speak more directly into the mic. Just move it over a little, please. Of course, Your Honor. That's great. Thank you very much. We seek reversal of the decision for two reasons. First, the amended complaint alleges a plausible claim under this Court's prior precedence of Braden v. Walmart Stores, Inc., Davis v. Washington University, and Matusik v. MidAmerican Energy Company. The second reason is that we believe the district court should have granted our motion to amend the complaint after dismissing the complaint. Initially, I think it is because this case was dismissed on the motion to dismiss, I think it is important to remember this Court stated in Davis v. Washington that at the pleading stage, at this point, the complaint only needs to give the district court enough to infer what is alleged that the fiduciary process was flawed. Further, as stated in Davis, every reasonable inference must be drawn in plaintiff's favor, and if its management is one plausible inference, the case cannot end here. To begin, the amended complaint alleged enough facts to plausibly infer imprudence, and the district court dismissed the complaint. Our primary allegations in this case is that the defendants breached the fiduciary duties to monitor the plan's record-keeping fees by overcharging for record-keeping. In Brayden v. Walmart, Counsel, we have a case, Matusik, a very well-written case, very recently. I have trouble seeing any meaningful difference between what is going on in your case and Matusik, just to be very plain with you. If you could just tell me how it is different, that would take me a long way down the road. Of course, Your Honor, and that is probably at the heart of this matter, what is the meaningful benchmark. I argue with Matusik in front of, at least, Judge Strass and two other judges. In Matusik, the case was brought, it was also a retirement plan, and it was brought by plaintiffs in the plan. The case alleged high record-keeping fees against Merrill Lynch, and alleged that Merrill Lynch was charging someone in the neighborhood of $300 per participant for record-keeping fees. What the defense said, and this court drilled down on, was that in Matusik, Merrill Lynch's $300 fee was not just based on record-keeping, but was actually based on other consulting fees and other things they did for the plan. So the plaintiffs in Matusik didn't allege an apples-to-apples comparison of the record-keeping fee in Mid-America to the other surveys and other things they had. And the reason is because the plaintiffs simply said $300 was too high for record-keeping compared to other plans. But, as the court pointed out, if you look at the statements which were brought into the additional documents and disclosures, the $300 wasn't just record-keeping. So, theoretically, plaintiffs didn't have a meaningful benchmark because it wasn't apples-to-apples. Here it's different. This claim here is more mature than the claim in the Matusik case. Did you say mature? More mature? No, no. Yes. Tell me what you're driving at with that. It's more refined. Refined. More refined. Well, what about the same services requirement? Matusik has two, as I read it, requirements. And the second, paid less for same services. Yes. So I have two responses for that. I'm sorry, it's the comparative firms paid less. Yes. I didn't do a full sentence. That's right. And to answer that question, I think it's important that I give some background as to how services are measured. And we see this in our brief. But one of the things, one of the documents that tell you what services are are record-keeping agreements, which these record-keepers have with the plan sponsor. Merrill Lynch had one. T. Will Price, the record-keeper here, has one. Fidelity has one too. These service agreements are not publicly available for the most part. So it is not available to plaintiffs initially or other people, other participants. So I say that to say that in order to plead actual record-keeping services, plaintiffs don't necessarily have access to the record-keeping agreements. What they do have publicly available to them is 5500s, which have service codes, which generally say that record-keeping is being provided. So what we did in this case is we looked at the 5500s and looked at the record-keeping service codes, which included record-keeping from T. Will Price. We looked at other comparator plans, which also had similar record-keeping codes, in order to assess that they had similar services. But additionally, the other factor which I think is important here is that, as we allege in the complaint, the services these nationwide record-keepers provide are commoditized and similar based on the size of the plan. This is a fungibility argument. Pardon me, Your Honor? This is a fungibility argument. That's right, Your Honor, which the Seventh Circuit in Hughes v. Northwestern accepted. Okay, I thought you would get to that. Yes, and that's all part of the plausibility argument. So that differentiates this case from Matusik? It does because we didn't have that. And here we go further. This is a $50,000 participant plan with $1 billion in assets. In our complaint, we allege that there's only 125 plans or over 50,000 participants, and the fact that the number of participants we have should result in lower record-keeping fees based on the fact that these record-keepings is fungible, it's a commodity-based, you should have, you would expect to have lower record-keeping fees for a plan this size. Counsel, let me ask you, so here's the problem I'm having with this one. So in Matusik, there was like almost a tenfold difference. I mean, it was a huge, it was like $300 versus, I want to say, $50, so not quite tenfold, but pretty big. Here we've got $49.56, and I think FedEx, would you agree that FedEx is probably the closest? I mean, I looked at the service, we compared the service codes, and it seems like FedEx is pretty close. Some of them had only one service code. And so you have a $19 difference per participant between O'Reilly and FedEx, but here's the problem. O'Reilly includes investment management, which is, I assume, we kind of looked into this, individualized services. Like, I'm going to tell you, you need this much in your portfolio versus that, and that, as you know, is very expensive. Other services, shareholder servicing fees, float revenue, and then something called other fees. And it's very possible, if not probable, that the $19.56 difference is accounted for by all of these other services. In other words, you're talking about a very small difference. I realize it's like 50%, but all these additional things that FedEx also does in their plan. So doesn't that present a problem for your theory? Well, Your Honor, I think at the pleading stage, we have to plead with what we have, and if this is what we're presented with. And we also allege that these other additional fees are minimal at best. How do we know that, or how do you know that? Because I've got to tell you, investment management fees are very expensive for plans. We saw that in Davis in particular. Correct, but the TRO price is a record keeper, so they shouldn't be doing investment management fees here. And that's one of the problems here for 5500s. They're often inaccurate, and when you get down to discovery, you find out that there were improperly placed codes in the 5500. So it makes it extremely difficult to distinguish. But the discrepancy, though, between even if you consider that there was additional fees for other services, but you have to compare it to not just the – I mean, we have multiple plans. We had other plans for TRO, which were $27 range, and others smaller than the O'Reilly plan. But here's the problem, and I know this from my time at a university. Different plans actually contract with the record keeper for different services. Some of them will include A, B, and C, and some of them will include A, and some of them will include A through E. And that's at least as plausible, if not more plausible, as to why there's a difference in fees. That's the problem I'm having with your argument. Well, and what we found is when you get into discovery that these differences are often not that huge. So we're not talking about a $2 or $3 difference. We're talking about $10, $12 differences between what the O'Reilly plans pay and what smaller plans are paying. So the difference, it should – if there was – and the reason we do that is to show that the – even if you account for possibility of other fees coming in, that the discrepancy is actually pretty big. Well, let me take the apples and oranges a little bit further, which is I think what you're asking us to do is there's apples, oranges, all kinds of different fruits in the fruit basket, right? And one fruit basket is more expensive than the other fruit basket. But one fruit basket is also bigger than the other fruit basket in the sense that there's more things in that fruit basket. And so my problem is comparing the price of a little fruit basket to a big fruit basket doesn't work very well, and you certainly can't figure out what the price of each individual piece of fruit within the fruit basket is. And that's the difficulty here is I don't know that we have enough to know whether there's a plausible case of mismanagement. Well, Your Honor, I would submit that's why these Third Circuit in Sweden versus the University of Pennsylvania, so these record-keeping cases are extremely difficult to solve under motions to dismiss. And they – and they're in favor of allowing for discovery when you have other circumstantial evidence. So here, it wasn't just comparisons to the other record-keepers and the other plans. We also talked about the total plan costs here, which were 125 percent higher than others. We pointed to the fidelity stipulation, which said, look, a big plan like fidelity, which was – Counsel, you're into your rebuttal. Oh, sorry. I'll reserve the license. No, it's cumulative here. Yeah, yeah. So to speak. Okay. Thank you. Mr. Hines. Good morning. Michael Hines on behalf of the appellees. May it please the Court. Your Honors, you cut right to the quick here, so I think I'm going to skip my introductory remarks and jump straight to the record-keeping. And with respect to record-keeping, the first amended complaint alleges that O'Reilly's plan participants pay approximately $47 to $87 annually per participant. And the amended complaint also says that they derived those fees from Forms 5500 and no other sources. That's exactly what the Matusik plaintiffs did. And that's exactly what the Matusik Court criticized. Because it noticed – the Matusik Court noticed or observed that Forms 5500, the problem with using those is they report total compensation, not compensation just for record-keeping fees. And, Your Honor, Strauss, as you mentioned, the record – the service codes here include, among other things, investment management fees. What about the two other TRO? They have two other TRO record-keeping firms. Sanofi and Ralph Lauren, as I understand, right? Are there two that have TRO as the record-keeper? Why aren't those comparable? Because – for this reason. And it's the fundamental problem, and it really disposes all of plaintiffs' arguments. Plaintiffs have not adequately pled what the O'Reilly plan pays for record-keeping services. The plaintiffs plead that we paid – or the participants paid $47 to $87 for some set of services. That includes record-keeping, but also includes investment management fees. And I heard Mr. Johndo say that while TRO Price is a record-keeper, they shouldn't be charging investment management fees. Well, there are TRO Price funds in the plan. TRO Price is not just a record-keeper. It's an investment manager, among other things. What about the fact, though, that the other TROs are $23 and $31 on their charts? Tell me if I don't understand their charts, but I think I do. Whereas they end up with a number on O'Reilly like $50, $49.56. So why aren't the TROs just about enough? So take the Sanofi case. I think you mentioned Sanofi? Yeah, I think I did, yeah. Let's take that one. In 2018, paragraph 96 of the complaint, and the form 5500 are not in the record for the comparator plans. So they are for the O'Reilly. Are those publicly available, counsel? Correct. Okay, proceed. Thank you. The Sanofi plan, the service code, there are three service codes listed there. In the O'Reilly plan, in the same year, 2018, there are 13 service codes, including investment management. How about Ralph Lauren? Can you tell me something positive? If you had more, by the way, on Sanofi, don't let me cut you off. No, no. As we say in southern Missouri, that was a very honest question by me. So Ralph Lauren, Your Honor, is probably the closest in the sense of the cumulative number of service codes. Correct, for sure. But I still think we're at the fundamental problem, because plaintiffs have not alleged what the O'Reilly participant said. You know about the number of codes on that one. You were good on the number of codes on the… I can count them up. Good. Looks like there are about 16 in 2018. On Ralph Lauren. And you have 13 on O'Reilly. And we have 13 in O'Reilly. Well, of course, the codes are very general. Proceed. They are. The codes are very general, and we still don't know… I'm sorry. I'm sorry. Go ahead. And we still don't know, based on the complaint, what O'Reilly pays. And I heard Mr. John do say, well, I need record-keeping agreements. That would probably help, but that's not exactly what he needs. As this court noted in the minors case, that plaintiffs have a lot of information available to them, because ERISA requires a lot of disclosure. And those disclosures include, for example, Rule 404A-5 disclosures that require the plan to give to participants. So these plaintiffs, annual disclosures describing any fees that they pay for planned services. Separately, plaintiffs have quarterly account statements. We all have them. If anyone's in a 401k plan or defined contribution plan, we get quarterly account statements. Those quarterly account statements are required to have a description of the services to which charges relate. Now, plaintiffs could have used their annual disclosures or their quarterly disclosures to plead what the record-keeping fees and only the record-keeping fees for this plan are, but they chose not to do that. They chose to use Form 5500s, which includes record-keeping fees, but a lot of other things, including investment management fees. And I'd submit to Your Honors there's no excuse for it, and it's inappropriate, because they have those documents. They don't need record-keeping documents. Does the added allegation here that these fees are more or less, or services are more or less fungible, help the plaintiff in this case? No, I don't think so. It's a response to a different argument. If I said, for example, yes, we pay $50, but you don't argue that that is available to me, I think the fungibility argument or allegation would be responsive to that. But I don't believe it's responsive to you haven't fundamentally pled what O'Reilly, what the participants pay for record-keeping. And I think that's a fundamental problem for the plaintiffs and disposes, frankly, of all of their arguments. I wonder if it's not also perhaps conclusory in the sense that it's just an assertion without any kind of factual basis behind it. It's true that on its face it's a factual assertion, but it seems to me it's not clear that it's based on anything other than just the person putting it on a paper or opening his mouth and stating it. I agree with Your Honor on that point. I think, thankfully for me, I don't have to wrestle with that, because I don't think they even get to there until they plead what their participants pay for record-keeping and record-keeping only. Counsel, in their complaint and any other materials before the court, do they have any other T. Rowe managed firms besides the two we talked about? And managed is not the right term, I know. Record-keeping firms that T. Rowe was the record-keeper for. Based on my chart that I'm looking at that we put together, no. You've identified mine, too. Thank you. Very briefly, I would like to move to plaintiffs say that investment management fees were too high. This is exactly matusik, no distinguishing at all, because here plaintiffs take the fees of 10 funds that O'Reilly has in their plan, and they have the fees for those, and they compare them to ICI medians and averages. The matusik court dealt with exactly that allegation. In fact, the allegation in this complaint and the allegation in the matusik, it's the same chart. Is it word for word? It's pretty much word for word. They have on the left-hand side of the chart the funds they challenge in matusik, just like us, but they're different funds, to be fair. They have the investment management fees, and to be fair, they're different investment management fees. Then they have a category called ICI average and ICI median, and they purport to compare those funds to the peer groups, the averages of the peer groups. As the matusik court said, the average of the peer group tells us nothing about what's comprised of that peer group. What's the investment style? What are their portfolio holdings? That kind of thing. I shouldn't ask, but I'm going to. Do they say what kind of average it is? Do you think it's a pure old grade school mathematical average, weighted average? I didn't look up the ICI report. If you don't know, tell me. I do not know, and it's not pled. Proceed. Just as a note, the risk with that is, I think, and this is what matusik was concerned about, is then you're going to almost create a presumption in favor of passively managed funds because you're going to end up with index funds because that's the only thing that will bring the average down, and you take away the independent decision maker from putting actively managed alternatives into the portfolio. You're exactly right. In fact, I almost said that in response to Judge Benton's question because that can deflate the average quite a lot, and that's the problem with using averages and medians because it tells us nothing of what is comprised of those averages. That's quite right. The last thing, Your Honor, that I'd like to address, well, I heard Mr. Janda talk about the fidelity stipulation and total plan costs. The fidelity stipulation has the same problem as the other comparators, and that is it's not pled what the O'Reilly plan pays for recordkeeping, and then the total plan costs, it's the same problem with using the averages and medians in the ICI. It tells us nothing of those plans, what's comprised of that average. And lastly, plaintiffs, they say that the district court abused its discretion in not allowing them to amend the complaint. I heard Mr. Janda say the district court denied our motion. There was no motion. There was a sentence at the end of an opposition brief to our motion to dismiss that said, well, if the court, if you're inclined to dismiss it, I want a chance to amend. There was no discussion of how it could be amended. There certainly was no further amended pleading. In that regard, plaintiffs, they previously amended in response to our first motion to dismiss, so they've amended once already. Plaintiffs never made a motion to amend, let alone file a proposed amended pleading as required by local rules in the Western District of Missouri. During the seven months between when this case was fully briefed on the motion to dismiss and when we argued it in May of 2023, plaintiffs submitted no less than three supplemental notices of authority, giving to the district court nine separate opinions, mostly from out of the Eighth Circuit, arguing why their pleading stated a claim. Nowhere in there did they say, well, we'd like to amend or we could amend. And then lastly, about two or three days after the oral argument, or I'm sorry, after the briefing closed on the motion to dismiss, this court rendered its decision in Matusik. We submitted a supplemental authority, and at no time did they say they could amend in light of the instructions in Matusik, particularly the criticisms of using Forms 5500 to try to plead record-keeping fees. So I would submit to your honors that the district court, and this is very similar to what happened in this court's decision in Riviera, where it said there's no abuse of discretion when there was no motion and you only made a request at the end of an opposition brief that you want the chance to amend if the court's inclined to dismiss. We would submit that there is no abuse of discretion in denying that. And I'm almost out of time. I'll just wrap up and say for all of those reasons and the reasons in our brief, we would say, and whether we consider the plaintiff's allegations holistically or one at a time, it doesn't matter, because nowhere do they plead a meaningful benchmark, as this court requires. And we would submit that the dismissal with prejudice should be affirmed. Counsel, I just want to ask, and this is, I think, a concern that I have, and it's also a concern that opposing counsel has, which is you don't want to make it so hard to plead one of these cases that they can never be pleaded. In other words, it could well be that there's a plan out there, maybe it's O'Reilly, maybe it's not, where just because there's different codes on the form 5500, there's no way to get at those and figure out what the underlying record-keeping costs are. And so at some point it just becomes impossible to plead one of these claims. What's your response to that? So a few responses. One, on the challenge plan side, so here the O'Reilly plan, there's no excuse at all to not be able to plead record-keeping fees in light of the extensive disclosures that ERISA requires. And I talked about that, the annual disclosure, the quarterly account statements. So that's one half of the piece. And now we have the comparator plans, 2A, two things that can happen there. 404A disclosures, while not as readily available as Forms 5500, I will grant you that, they are available publicly. You just have to search and find them. There is a recent case just a few weeks ago in the District of Minnesota, and just so the record's clear, it's a U.S. bank court, and the citation is 2024 Westlaw 1216519. It came out just a couple weeks ago where the plaintiffs pled the record-keeping fees for the challenge plan through 404A5 disclosures, like I mentioned, and they pled record-keeping fees for the comparator plans using 404A5 disclosures. That is an apples-to-apples comparison. So that's one way. The second way, I think theoretically anyway, again, taking the challenge plan, you have your 404A5 disclosures, and you can, I suspect, you can find Forms 5500 that are limited to service codes of record-keeping. Those exist. You might have to hunt for them, but they exist. And there's one in this case, actually. And I think that might be another way to do it. But to be fair, that's not what we have here. Thank you. Thank you very much. Thank you for the argument. Mr. Janda. Thank you, Your Honor. With my remaining time, I just want to address three points. I'll start with the 404A argument and the account statements. So I think this is a bit disingenuous coming from the defense bar, because with respect to services, the 404A and account statements only generally describe what services are. If we were to cite to those, it would be meaningless, because it would just say you're paying X amount for record-keeping services. And we'll be right back to where we are, again, where this court's asking whether you can compare services to different plans. I think what the 404A and other account disclosures can more readily do is point to the exact amount that plaintiffs are paying for record-keeping. But that doesn't answer the services question. It just answers what are you paying for record-keeping, which is what we get from the 5500s. I would say, related to this point, I think Your Honor's going to ask me, and my opposing counsel has said, well, T. Will Price does investment management. Well, one of the things that ERISA requires is that fiduciaries make sure that they consider all fees being paid to a record-keeper to make sure it's reasonable. So to the extent that T. Will Price, the record-keeper, was receiving additional money here for other services, it needed to be considered in terms of whether or not the record-keeping fees were reasonable. Again, that goes to why discoveries needed to delve more into these issues. The second thing is, the investment management fees were really meant to bolster the imprudent process. If you have expensive fees, you're not really being prudent, and that bolsters our case in that round. Can I ask one more question? This is the problem. If we allow this case to go forward, how is discovery going to help? You're going to learn a lot more about O'Reilly, but you're still going to face the same problems with all the peer plans. You're just going to be going off these documents, and so you might learn exactly what's in O'Reilly's basket, but you aren't going to learn what are in these other baskets. Your Honor, that's where expert discovery comes in, and that becomes our burden in discovery. We have experts that come in who have expertise in what is in other plans and what other plans should be there. Can't you rely on those experts on the front end when you're pleading and then have them? I mean, if that's what you're looking for, you have access to that now. Unfortunately, we actually tried that in the case, and our expert report was rejected as not being part of the other rule 10. You can't do that. So, again, plain as a hamstrung, you're damned if you do, you're damned if you don't. Thank you, counsel, for the argument. Thank you, Your Honor. Case number 23-2501 is submitted for decision by the court. Ms. Henderson. Yes, Your Honor. The next case on the docket is 23-1878.